■ ROGER MALEBRANCHE et al., Appellants, v SUNNYVIEW REHABILITATION HOSPITAL et al., Respondents. [847 NYS2d 260]—

Lahtinen, J. Appeals (1) from an order of the Supreme Court (Reilly, Jr., J.), entered June 7, 2006 in Schenectady County, which, among other things, granted a motion by defendant Ellis Hospital for summary judgment dismissing the complaint against it, and (2) from an order of said court, entered September 29, 2006 in Schenectady County, upon a dismissal of the complaint at the close of plaintiffs' case.

Plaintiff Roger Malebranche (hereinafter plaintiff) contends that he suffered a preventable progression of a stroke as a result of the medical malpractice of the various defendants. On June 2, 2000, plaintiff was treated in the emergency room at St. Clare's Hospital, where he was diagnosed with a stroke and was transferred to the neurology intensive care unit at defendant Ellis Hospital. An MRI taken that same day revealed an area four millimeters in diameter in the right medulla where the

stroke had occurred. He was treated by physicians from Neurological Associates of Northeastern New York, P.C., including defendants Mark Blakeslee, Sheldon Staunton and Richard Brooks. Plaintiff, who is also a physician, requested that his cardiologist, William Vacca, be consulted. Blakeslee and Vacca reportedly agreed on a plan to allow plaintiff, who had a history of high blood pressure, to have his blood pressure remain high while recovering from the stroke and not to treat him with blood pressure medicine unless the blood pressure exceeded 180. The plan apparently was not followed and plaintiff was given medicine which lowered his blood pressure despite the fact that it already was below 180.

Following complaints of weakness in his left arm, an MRI on June 5, 2000 revealed that the stroke now measured five millimeters in diameter. Plaintiff was then placed on Heparin and remained on it until June 7, 2000. On June 8, 2000, he was discharged from Ellis Hospital to the adjacently located defendant Sunnyview Rehabilitation Hospital. At approximately 4:30 A.M. the following morning, plaintiff awoke with nausea, severe headache, slurred speech and slanted vision. A nurse reported these symptoms to an associate of Vacca. Plaintiff was examined by a doctor at Sunnyview between 8:00 A.M. and 9:00 A.M., Brooks was contacted about 9:45 A.M. and Brooks ordered a "stat" MRI. The MRI, which was mislabeled as routine, was conducted at about 1:00 P.M., with Brooks reviewing the results shortly after 2:00 P.M. Brooks observed an increase in the dimension of the stroke and directed plaintiff's immediate transfer back to Ellis Hospital, where Heparin treatment resumed and continued until June 13, 2000.

Plaintiff and his wife, derivatively, commenced this action and their primary theories were that the stroke progressed and his condition worsened markedly as a result of improper blood pressure management and an unacceptable delay in administering Heparin. Prior to trial, Supreme Court granted the motion of Ellis Hospital dismissing the complaint as to it. Following plaintiffs' proof at trial, Supreme Court granted the motion of the remaining defendants to dismiss for failure to establish a prima facie case. Plaintiffs appeal both from the summary judgment order and the trial order of dismissal.

"[A] doctor may be liable only if the doctor's treatment decisions do not reflect his or her own best judgment, or fall short of the generally accepted standard of care" (*Nestorowich v Ricotta*, 97 NY2d 393, 399 [2002]). A prima facie case of medical malpractice also requires proof that the doctor's deviation from appropriate care was a proximate cause of the patient's injury

(see *Rossi v Arnot Ogden Med. Ctr.*, 268 AD2d 916, 917 [2000], *lv denied* 95 NY2d 751 [2000]; *Giambona v Stein*, 265 AD2d 775, 776 [1999]). When granting judgment as a matter of law within the procedural context of a CPLR 4401 motion, the trial court must determine that "there is no rational process by which the fact trier could base a finding in favor of the nonmoving party" (*Szczerbiak v Pilat*, 90 NY2d 553, 556 [1997]).

We consider first the evidence regarding the management of plaintiff's blood pressure. Plaintiffs' expert, neurologist Anthony Santiago, testified that plaintiff had suffered an ischemic stroke, resulting from insufficient oxygen because of a lack of blood flow. He stated that, when a person suffers such a stroke, the person's systolic blood pressure naturally elevates to deliver more blood flow to the injured portion of the brain. According to Santiago, the standard practice in neurology as of June 2000 was to permit systolic blood pressure of at least 180 following a stroke. He further opined that having a prolonged period of low blood pressure following a stroke can result in a larger stroke since the area around the initial stroke is deprived of necessary oxygen.

In cross-examination, Santiago acknowledged that there was not "universal consensus" regarding poststroke levels of blood pressure, but he maintained that the general recommendation was not to lower blood pressure unless it was above 220 or there was end organ damage. Indeed, Blakeslee and nonparty Vacca reportedly agreed that plaintiff's systolic blood pressure would be maintained at an elevated range of 160 to 180 and would not be treated with medicine so long as it did not exceed 180. Blakeslee stated that there was a general consensus that an increase in blood pressure was beneficial for a patient after a stroke. There was evidence that, although plaintiff's blood pressure never exceeded 172, he received blood pressure medicine on June 2 and 3, 2006 and, further, the dosage was increased on June 5 and 6, 2000. By June 8, 2000, plaintiff's systolic blood pressure dropped below 100.

Santiago opined that plaintiff's low blood pressure prevented the area of the brain affected by the stroke from getting adequate blood and caused him to suffer a larger and more severe stroke on June 9, 2000. Plaintiff's testimony detailed the many ways in which his condition was worse after June 9, 2000. While there was certainly evidence that weakens aspects of plaintiffs' case, we are concerned in the current procedural posture with the evidence most favorable to plaintiffs. Here, such evidence established that the preferred course of care was to keep plaintiff's blood pressure elevated and that the neurologists

treating plaintiff together with the nonparty cardiologist charted such a course as proper care. They failed to follow that course, plaintiff's condition deteriorated, and plaintiffs' expert provided testimony linking the two. We conclude that it was error to dismiss at the close of plaintiffs' proof the action premised upon blood pressure management as to Blakeslee, Staunton, Brooks and Neurological Associates.

The remaining issues do not require extended discussion. On cross-examination, Santiago acknowledged that, as of 2000, it was not a deviation from proper medical care not to use Heparin. He acknowledged potentially significant side effects existed and that whether to use the drug was still controversial without consensus. Moreover, there was insufficient evidence of causation with regard to alleged delays in administering Heparin and deterioration of plaintiff's condition. Therefore, dismissal was appropriate as to such theory (*see LaPierre v Efron*, 22 AD3d 808, 809 [2005]; *Perrone v Grover*, 272 AD2d 312, 312-313 [2000]). Similarly, Ellis Hospital's summary judgment motion was properly granted.

Mercure, J.P., Mugglin, Rose and Kane, JJ., concur. Ordered that the order entered June 7, 2006 is affirmed, without costs. Ordered that the order entered September 29, 2006 is modified, on the law, without costs, by reversing so much thereof as dismissed the complaint as to defendants Sheldon B. Staunton, Richard B. Brooks, Mark A. Blakeslee and Neurological Associates of Northeastern New York, P.C.; matter remitted to the Supreme Court for further proceedings not inconsistent with this Court's decision; and, as so modified, affirmed.